IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01610-DDD-MDB

SUSAN DEHERRERA; and
JOSE GUERRERO,

      Plaintiffs,

v.

HUERFANO COUNTY, a municipality;
JEFF BENSMAN, in his individual capacity;
TERRY SANDOVAL, in his individual capacity; and
SAM JENSEN, in his individual capacity,

      Defendants.

---

## RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FROM DEFENDANT JEFFREY BENSMAN

---

Defendant Jeffrey Bensman ("Defendant"), via counsel, Hall & Evans, L.L.C., and under Fed.R.Civ.P. 56, submits his Response to Plaintiffs' Motion for Summary Judgment, stating as follows:

## I. <u>INTRODUCTION</u>

Susan DeHerrera and Jose Guerrero ("Plaintiffs") seek judgment as a matter of law under 42 U.S.C. § 1983 for Defendant's alleged unlawful "search" of the subject real property ("Property") in Huerfano County, Colorado ("County"). But applicable federal law confirms Defendant didn't unlawfully "search" either Plaintiffs' curtilage, or their "effects", under the Fourth Amendment. Even if he "searched" anything, either it was a de minimis violation or (alternatively) qualified immunity shields him

because the law wasn't clearly established as of his July 13, 2021 visit to the Property. Additionally, Plaintiffs' own version of events is materially, blatantly contradicted by Defendant's BWC evidence and shouldn't be credited. For these reasons, Defendant respectfully requests Plaintiffs' Motion be denied.

## II.  RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")[1]

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Disputed. Date of incident was 07/13/2021, Plaintiffs resided in camping trailer, not RV, and the Property was more than 143 acres. [*See* Statement of Additional Disputed Facts ("SADF") ¶¶32, 47, 69].

5.    Disputed. Date of pump installation was 07/13/2021. [ECF 70-1].

6.    Disputed. Guerrero didn't own the Property on 07/13/2021, and the pump wasn't confirmed installed until 07/17/2021. [SADF ¶ 52; **Ex. I**, Test Report, p.1].

7.    Disputed. The well clearly was visible to public. [ECF 72-3, 00:15-00:24.]

8.    Undisputed that on 07/13/2021, Plaintiffs didn't have water piped directly into their trailer. [ECF 70-8].

9.    Disputed. The pump was in process of being installed on 07/13/2021. [ECF 72-3, 00:01-10:35.]

---

[1] "Undisputed" facts are undisputed for this Response only. Defendant reserves the rights to dispute same later and to argue other material facts are undisputed.

10. Disputed. Date of incident was 07/13/2021, Plaintiffs resided in camping trailer, not RV, and trailer was at least 40 feet from well site. [SADF ¶64].

11. Disputed. The County regulates water connections, for which permits are required, and did so on 07/13/2021. [**Ex. J**, Cnty. Resolution 17-13, p.1 (adopting 2015 IRC); **Ex. K**, IRC Section 105.1 (Permits Required), p.1].

12. Disputed. County Environmental Health Director Robin Sykes asked Defendant to visit the Property for a potential code violation. [ECF 70-2 ¶6; ECF 70-3, 18:13-17 ("Sachs")]. As Defendant approached the Property, his view of all activities then occurring on it was unobstructed. [SADF ¶37].

13. Disputed. Defendant and Mr. Sandoval visited the Property on 07/13/2021 due to a potential code violation. [ECF 70-2 ¶6; ECF 70-3, 18:13-17 ("Sachs")].

14. Disputed. Mr. Sandoval didn't park his truck "just a few feet away" from the well site, but at least two truck lengths away. [ECF 72-4, p.2; SADF ¶63].

15. Undisputed.

16. Disputed. Defendant and Mr. Sandoval didn't approach within a few feet of the well site, but instead stayed about 40 feet away. [*See* SADF ¶63; ECF 70-1].

17. Disputed. Not until more than halfway into the brief encounter did DeHerrera demand Defendant and Mr. Sandoval leave. [ECF 70-1, 06:19-06:22].

18. Disputed. After DeHerrera demanded Defendant and Mr. Sandoval leave, Defendant took a mere few steps toward the direction of the well site, then spoke with Plaintiffs while standing at Mr. Sandoval's truck, and then he and Mr. Sandoval proceeded to leave. [*See **id.***, 06:22-10:35].

19. Disputed. While on the Property, Defendant didn't come within at least 40 feet, *i.e.* two truck lengths, of the specific spot of pipeline installation and didn't look into that spot either. [SADF ¶63; ECF 70-1].

20. Disputed. Plaintiffs resided in camping trailer, not RV, and trailer was at least 40 feet from well site. [SADF ¶64].

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Disputed. Mischaracterizes the code enforcement policy, which states:

2. Announced/Unannounced Field Visits.
At the discretion of Code Enforcement staff or other assigned staff, a field visit to the vicinity of the subject property may be conducted with or without prior notice to the property owner, occupant, or alleged code violator. The determination of whether or not to give prior notice shall be made on the basis of the following criteria:
a. The nature of the alleged violation;
b. Whether or not prior notice will make detection and documentation of the alleged violation more difficult; and
c. Whether or not prior notice will unnecessarily increase the risk or violent confrontation or injury to staff.
3. Entering Upon Property or Premises.
Code Enforcement staff may enter upon private property to conduct a field investigation without authority to enter. Code Enforcement staff may enter property to seek permission to investigate the premises. If the property owner refuses access at any time, the investigation shall be conducted from public roads or property where permission to enter has been granted. If Code Enforcement staff are refused access or entry, and entry is necessary to conduct the investigation, staff shall consult with the County Court Judge to go about obtaining an administrative search warrant.

[ECF 70-6, pp.10-11].

25. Disputed in part. While Plaintiffs may have accessed and read the relevant policy, record evidence confirms they didn't "understand" the policy. [SADF ¶¶55, 57 (Plaintiffs' verbal and physical aggression); **Ex. J**, p.1; **Ex. K**, p.1].

26. Disputed. The policy speaks for itself, but record evidence confirms Plaintiffs didn't "understand" the policy properly in context or circumstances. [SADF ¶¶55, 57 (Plaintiffs' verbal and physical aggression); **Ex. J**, p.1; **Ex. K**, p.1].

27. Disputed. Defendant testified: "Q: [W]hen you were on the property ... were you conducting any investigations? A: Always." [ECF 70-3 p.4, 30:18-20].

28. Disputed. Defendant testified: "We would ask simply as a courtesy but it was not necessary according to -- according to what we were instructed." [***Id.*** p.5, 31:4-5].

29. Disputed. Defendant testified: "Q: Okay. And at no time that you had been on the property did you ever obtain an administrative warrant, did you? A: No, no, no. No, but I did file several complaints…" [***Id.*** p.5, 31:9-12].

30. Disputed. Defendant testified permission wasn't required to access or stay on the Property according to what he was instructed by the Huerfano County code enforcement policy and the County's former attorney. [***Id.*** pp.4-5, 30:21-31:8].

31. Disputed. Date BWC was filmed was 07/13/2021. [ECF 70-1].

### III.  STATEMENT OF ADDITIONAL DISPUTED FACTS[2]

32.     On July 13, 2021, Defendant used a body-worn camera recorder ("BWC") to video-record his entire visit to the Property. [*See* ECF 70-1].

33.     Defendant's code enforcement activities were purely complaint-based, whether from citizens or County officials. [ECF 70-2, ¶3; ECF 70-3, 30:23-31:1].

34.     When Defendant inspected properties in the County, he carried his own personal pistol, because he often responded to inspection requests alone and involving property owners potentially posing a physical threat. [ECF 70-2, ¶4].

35.     Defendant carried this pistol onto the Property and wore the bulletproof vest the County issued him. [ECF 70-2, ¶5].

36.     Defendant approached the Property, zoned agricultural, by driving on La Deora Boulevard, an access road owned not by Plaintiffs, but by Rio Cucharas Ranches of Colorado Subdivision. [ECF 70-1, 00:04-00:11; ECF 70-2, ¶7; ECF 70-4].

37.     From La Deora Boulevard, before entering the Property, Defendant had an unobstructed view of all activities then occurring on it. [ECF 70-2, ¶8].

38.     From La Deora Boulevard, before entering the Property, Defendant saw Water Works Plus ("WWP") personnel installing a "pipeline". [ECF 70-1, 00:28-00:33].

---

[2] Per DDD Civ. P.S., Section E(1)(e), Defendant titles this section "Statement of Additional Disputed Facts" but notes this title is misleading, as Plaintiffs might not actually dispute several such facts and, therefore, treats this section as "Statement of Additional Material Facts."

39.     From La Deora Boulevard, before entering the Property, Defendant clearly saw a "big blue container" near the "pipeline" installation site. [ECF 70-1, 00:14-00:17].

40.     From La Deora Boulevard, before entering the Property, Defendant clearly saw two trucks with WWP livery, including a 20-foot-long Ford F-450 with a crane effectuating the installation. [ECF 70-1, 00:36-00:40; ECF 70-2, ¶11].

41.     This crane was approximately 50 feet high. [ECF 70-5, at 21 (177:6-23)].

42.     From La Deora Boulevard, Defendant clearly saw the whole Property before entering it. [ECF 70-2, ¶13].

43.     Defendant followed County Building Inspector Terry Sandoval onto the Property—both drove separately. [ECF 70-1, 00:41-00:43; ECF 70-5, 8-9 (81:17-82:16)].

44.     Defendant entered the Property driving north-to-south about 00:55 into his BWC video, given visible overhead telephone poles and wires. [ECF 70-1, 00:53-00:57; *see id.*, 02:52-02:54 (poles and wires from different angle)].

45.     These poles and wires roughly paralleled the Property's northern border. [ECF 70-2, ¶17].

46.     No physical barrier kept Defendant from the Property. [ECF 70-2, ¶18].

47.     Guerrero and DeHerrera lived on the Property in a non-self-propelled camping trailer they called "the fifth wheel". [ECF 70-5, 14-16 (91:5-93:5)].

48.     The fifth wheel was unfenced and unenclosed. [*See generally* ECF 70-1].

49.     Defendant parked on the Property 01:11 into his BWC video and exited his truck. [ECF 70-1, 01:11-01:36].

50.     Defendant approached Mr. Sandoval's truck. [ECF 70-1, 01:36-01:48].

51.     Guerrero stated, "Get off our property now." [ECF 70-1, 01:45-01:46].

52.     Guerrero didn't have any ownership interest in the Property in 2021. [ECF 70-5, 3-6 (43:13-44:11, 45:6-9, 45:23-46:12)].

53.     DeHerrera co-owned it with family. [ECF 70-5, 3-6 (43:13-46:12)].

54.     Guerrero stated, "Susan, report these assholes here." [ECF 70-1, 01:54-01:56].

55.     As Defendant tried speaking with a male WWP employee about whether WWP was licensed to operate in the County, Guerrero walked between them and gave Defendant a forearm shove while stating, "Don't push me, man." [ECF 70-1, 02:18-02:23; ECF 70-2, ¶27; ECF 70-7, at 02:13-02:15].

56.     Defendant again asked the WWP employee whether WWP had a license to operate in the County, and the employee indicated he needed to call his boss about it. [ECF 70-1, 02:29-02:40].

57.     The following exchange occurred:

GUERRERO: You know, every time I'm gonna see you, I'm gonna kick
your ass, buddy.
DEFENDANT: You just --
GUERRERO: Guaranteed.
DEFENDANT: -- threatened an officer of the Court.
GUERRERO: Yeah.
DEFENDANT: You're going to jail.
GUERRERO: You know what? Fuck you.

DEFENDANT: You're going to jail.

[ECF 70-1, 2:45-2:52; ECF 70-2, ¶29; ECF 70-7, 02:37-02:45].

58.     Defendant went to his truck, deposited his pistol, and returned without it. [ECF 70-1, 02:50-03:22; ECF 70-2, ¶30; ECF 70-7, 02:43-03:15].

59.     While returning to the WWP trucks, Defendant passed the "big blue container" he'd observed before entering the Property—a cistern going into the trench Guerrero dug with a backhoe—and  Defendant saw the backhoe stored on the Property. [ECF 70-1, 03:12-03:15; ECF 70-5, 9-10 (82:17-83:9)].

60.     Near the cistern, Defendant saw another vehicle, another camping trailer, a storage trailer, and piles of junk, which Plaintiffs confirmed was storage for a friend. [ECF 70-1, 03:12-03:15; ECF 70-5, 12-13 (85:14-86:9), 17-19 (100:8-102:10)].

61.     Defendant radioed the County Sheriff's Office for potential response, and spoke telephonically about WWP's work with "Fred" (WWP management), who advised WWP was installing the cistern and a pipeline. [ECF 70-1, 03:22-05:55].

62.     Defendant and Sandoval received confirmation WWP apparently secured an appropriate license. [ECF 70-1, 06:25-07:00; ECF 70-2, ¶35].

63.     While on the Property, Defendant didn't approach at least 40 feet, *i.e.* two truck lengths, of the specific spot of pipeline installation and didn't peer into it. [*See* ECF 70-1; ECF 70-1, 06:00-06:54; ECF 70-2, ¶36; ECF 70-7, 00:01-01:53].

64.    The specific pipeline installation spot was at least 40 feet, *i.e.* two truck lengths, from the corner of Plaintiffs' fifth wheel. [*See generally* ECF 70-1*;* ECF 70-2, ¶37; ECF 70-7, 00:01-01:53; ECF 70-8, at 00:01-00:13].

65.    While present on the Property, Defendant never touched Guerrero on the chest. [*See generally* ECF 70-1; *see also* ECF 70-2, ¶38; ECF 70-7].

66.    Defendant and Sandoval then jointly decided to leave, and Defendant cancelled law-enforcement response. [ECF 70-1, 09:00-09:42].

67.    On BWC, Defendant walked back to his truck 09:43, began reentering his truck 9:54, completed reentry 10:00, began driving away from the Property 10:06, exited the Property 10:22, and turned off the BWC 10:35. [ECF 70-1, 09:43-10:35].

68.    Defendant's BWC recorded continuously for the entire 10:35 runtime, and Defendant didn't turn it off while physically present on the Property. [*See generally* ECF 70-1; *see also* ECF 70-2, ¶41].

69.    The Property was more than 143 acres. [ECF 70-4].

70.    In July 2021, Plaintiffs' activities on the Property related to farming, cattle, and agritourism. [ECF 70-5, 7 (60:5-25), 13 (86:6-16), 20 (136:18-22)].

71.    On July 13, 2021, Defendant didn't cause the Property physical damage. [ECF 70-5, 22 (192:3-6)].

## IV.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On summary judgment, a court views evidence favorably to nonmovant, *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008), who "is entitled to reasonable inferences from the record[.]" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is inappropriate where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* The Court "cannot ignore clear, contrary video evidence in the record depicting the events as they occurred." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir. 2017). And where video evidence contradicts a given argument's factual basis, that argument isn't credible. *Farrell v. Montoya*, 878 F.3d 933, 938 (10th Cir. 2017). Where movant "has the burden of proof, a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Movant "must establish, as a matter of law, all essential elements" before nonmovant must advance specific facts rebutting movant's case. *Id.*

## V. <u>ARGUMENT</u>

### A. Defendant Didn't Conduct an Unlawful Search Within Curtilage.

#### 1. Defendant didn't intrude upon Plaintiffs' curtilage.

Plaintiffs assert Defendant conducted an unlawful search by intruding on the "curtilage" of their camping trailer to gather information. Rubbish.

11

Curtilage "is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life", and is "part of the home itself" under the Fourth Amendment. **Oliver v. United States**, 466 U.S. 170, 180 (1984) (quotations omitted). Conversely, "open fields" encompasses "any unoccupied or undeveloped area" outside curtilage, and "need be neither 'open' nor a 'field' as those terms are used in common speech." **Id.** at 180 n.11. An open field (even privately owned) is searchable without probable cause, *see* **Hester v. U.S.**, 265 U.S. 57, 59 (1924), because citizens can't "legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." **Oliver**, 466 U.S. at 178. "[O]nly the curtilage warrants Fourth Amendment protections." **Id.** at 179 (citation omitted).[3] And while curtilage isn't necessarily searchable without probable cause, "no reasonable expectation" exists a home and curtilage are "free from ordinary visual surveillance." **U.S. v. Hatfield**, 333 F.3d 1189, 1196 (10th Cir. 2003).

The Court assesses: (a) did the owner show a subjective expectation of privacy in "curtilage", and (b) is that expectation objective, *i.e.*, societally recognized as reasonable. *See* **id.** at 1195 (quoting **Katz v. U.S.**, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). The relevant "curtilage" factors are: (1) proximity to the "home"; (2) whether it's in an enclosure around the "home"; (3) the nature of its uses; and (4) the steps plaintiffs took to protect it from passerby observation. *See* **U.S. v. Dunn**, 480

---

[3] Defendant doesn't contend the visit constituted an administrative search. *E.g.*, **City of L.A. v. Patel**, 576 U.S. 409, 419-23 (2015).

U.S. 294, 301 (1987). Plaintiffs argue these factors favor them and show their well site and its contents were "curtilage". They're wrong.

<u>First</u>, Plaintiffs assert the well site and its contents were "just several feet from their RV home" and thus closely proximal. Not so. The specific spot of pipeline installation, about 40 feet away from the trailer [SADF ¶64], wasn't close enough to the trailer to be "curtilage." This is because areas near homes are outside the curtilage when merely 20-50 feet away. *E.g.*, ***U.S. v. Bell***, 191 F.App'x 663, 668 (10th Cir. 2006)(50 feet); ***U.S. v. Brady***, 993 F.2d 177, 178-79 (9th Cir. 1993)(45 feet); ***U.S. v. Jackson***, 728 F.3d 367, 374 (4th Cir. 2013)(trashcan with drug paraphernalia, on grass strip beyond patio and "at least 20 feet" from backdoor in apartment complex with shared sidewalks, not in curtilage); ***U.S. v. Wilburn***, 2012 U.S.Dist.LEXIS 66300, at *8-11 (E.D. Ky. Mar. 5, 2012)(propane tank 20-30 feet away from trailer wasn't in curtilage). Moreover, Defendant stayed about 40 feet away from the specific installation spot, consequently 80-ish feet away from the trailer. [SADF ¶¶63-64].

Plaintiffs don't discuss, and thus concede, the <u>second **Dunn**</u> factor. Neither their trailer nor any component of the Property reasonably near it had an enclosure "demark[ing] a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." **Dunn**, 480 U.S. at 302. Nor any other clear markings of a curtilage area[4], as required. *See **Florida v. Jardines***, 569 U.S.

---

[4] *E.g.*, ***U.S. v. Beene***, 818 F.3d 157, 162-63 (5th Cir. 2016)(driveway not curtilage given only partial fencing and unobstructed view from public street).

1, 7 (2013). A perimeter fence (if one existed) doesn't count, especially considering it'd encircle more than 143 acres. *Cf.* **U.S. v. Belisle**, 2013 U.S.Dist.LEXIS 17805, at *15 (D. Me. Feb. 11, 2013)(argument camper's curtilage extended to perimeter fence on plaintiff's property meant "the little camper enjoyed a curtilage of approximately 70-80 acres. That theory stretches the curtilage concept beyond recognition.").

Third, for the nature of the water system's use, Plaintiffs assert the well and pump were "extensions" of the trailer by being their primary source of water and thus in an area "intimately linked" to the home. To the contrary, the Property was zoned agricultural and by Plaintiffs' admission was so used, which use repeatedly is deemed open fields. [SADF ¶¶36, 70]; *e.g.*, **U.S. v. Anderson-Bagshaw**, 509 F.App'x 396, 403-04 (6th Cir. 2012)("Without a doubt, the 'barnyard' and 'pasture' areas were outside the curtilage of Bagshaw's home."); **U.S. v. Van Damme**, 48 F.3d 461, 464 (9th Cir. 1995). Regardless, even a front yard isn't curtilage absent sufficient objective evidence the yard is being "used for intimate activities of the home." **Reeves v. Churchich**, 484 F.3d 1244, 1255 (10th Cir. 2007). Particularly not where, as here, the area adjoining the cistern and trailer was used for storage of other trailers, multiple vehicles, and piles of junk. [RSUMF ¶¶59-60]; *see* **Bell**, 191 F.App'x at 668 (relevant area was "used to store vehicles and trailers, hardly a private activity associated with the intimacy of a home"); **U.S. v. Powell**, 840 F.App'x 316, 319 (10th Cir. 2020)(boat storage disfavored curtilage). Anyway, installing a pipeline and cistern isn't closely associated with intimate domestic activity.

Fourth, Plaintiffs claim they took "steps" to protect the well site from passerby observation, but plainly these steps weren't substantial. Plaintiffs merely assert they: installed the system below ground and not visible to the public; placed it 258 feet from a public roadway, and used it as their private and primary source of water to the exclusion of the public (the last of which, is irrelevant regarding whether they protected it from passerby observation). Despite these so-called "steps", Defendant (from La Deora Boulevard and before entering the Property) had an unobstructed view of all activities on the Property, namely: WWP personnel installing a pipeline, a big blue container near the pipeline installation site (the cistern), two trucks with WWP livery including a 20-foot-long Ford F-450 with a 50-foot-high crane effecting installation, no physical barrier excluding him from the Property, and an unfenced, unenclosed, non-self-propelled, camping trailer. [SADF ¶¶37-42, 46-48].

Moreover, even if Plaintiffs had installed a "No Trespassing" sign, perimeter fence, or open gate, these wouldn't matter and could be navigated without invoking the Fourth Amendment. S*ee **Oliver***, 466 U.S. at 179 ("it is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas"); ***Dunn***, 480 U.S. at 301-05; ***U.S. v. Lewis***, 240 F.3d 866, 871 (10th Cir. 2001)(no reasonable expectation of privacy though property was surrounded with an eight-foot fence, locked gates, and numerous "No Trespassing" signs). Nor does a "homeowner" telling an official standing on open acreage that he didn't have a right to be there invoke the Fourth Amendment. *See **Rieck v. Jensen***, 651 F.3d 1188, 1189,

1191-94 (10th Cir. 2011)(entry onto non-curtilage private property, by opening closed gate with "No Trespassing" sign and despite homeowner telling official he had no right to enter, wasn't unconstitutional).

Further, Plaintiffs rely on **Collins** to support their well site being within their trailer's curtilage because in **Collins**, the court found a homeowner's partially visible, open-air carport to be considered curtilage. But the court found the carport to be curtilage because it was erected over the home's driveway and directly adjacent to the home. *See **Collins v. Virginia***, 584 U.S. 586, 593-94 (2018)("Just like the front porch, side garden, or area 'outside the front window,' the driveway enclosure ... constitutes 'an area adjacent to the home and 'to which the activity of home life extends,' and so is properly considered curtilage.")(citations omitted). A home's driveway is visible, but Plaintiffs' well site is 40 feet from, and not connected to, the trailer and can't be considered within its curtilage.

### 2. Even if Defendant committed a "search", it was *de minimis.*

At the most, Defendant's brief visit to the Property after learning of a potential code violation [RSUMF ¶12; SADF ¶32], where he didn't damage the Property [SADF ¶71] and saw all he needed to confirm the potential violation prior to entering the Property [SADF ¶¶37-42], was a mere trespass, not a constitutional violation. *See **U.S. v. Karo***, 468 U.S. 705, 713 (1984). Nor was he physically violent with Plaintiffs; if anything, Plaintiffs verbally and physically threatened him. [SADF ¶57; *see* ECF 70-1]. Even if Defendant had damaged the Property, with lack of intent (or ability) to

make an arrest, and without permanent injury to property, there can be no federal constitutional violation. *E.g.*, ***Porter v. Jewell***, 453 F.App'x 934 (11th Cir. 2012)(damage to doorframe by official conducting welfare check, subsequently fixed, not actionable); ***Parker v. Moriarty***, 2018 U.S.Dist.LEXIS 38581, at *6-12 (S.D. Fla. Mar. 8, 2018). So even if Defendant did violate Plaintiffs' Fourth Amendment rights (he didn't), such violation was an unactionable de minimis violation. *See **U.S. v. Jacobsen***, 466 U.S. 109, 125-26 (1984); ***Artes-Roy v. City of Aspen***, 31 F.3d 958, 963 (10th Cir. 1994)(civil code inspector didn't violate constitutional rights by visiting property to conduct code enforcement inspection, and even if he did it was unactionable de minimis violation); ***Widgren v. Maple Grove Twp.***, 429 F.3d 575, 585-86 (6th Cir. 2005)(no Fourth Amendment "search" where property assessor entered curtilage for naked-eye observation of house's plainly visible exterior attributes and dimensions, "all without touching, entering or looking into the house").

**B. Defendant Didn't Unlawfully Search Plaintiffs' "Effects."**

**1. The well site components on the Property weren't "effects."**

Alternatively, Plaintiffs argue Defendant's visit to the well site constituted an unreasonable search of their "effects" under the Fourth Amendment. But Plaintiffs haven't shown the well site comprised an "effect" under the Fourth Amendment—indeed, federal law confirms just the opposite.

"The term 'effects' is less inclusive than 'property' and cannot be said to encompass open fields." ***Oliver***, 466 U.S. at 177. Instead, the word refers specifically

to personal property like "goods and moveables," not real property. ***Altman v. City of High Point***, 330 F.3d 194, 201 (4th Cir. 2003); *accord* ***Mayfield v. Bethards***, 826 F.3d 1252, 1256 & n.3 (10th Cir. 2016). This distinction illustrates the Fourth Amendment's focus on protecting personal possessions from unreasonable government intrusion. Indeed, in his final draft of the Fourth Amendment, James Madison proposed the following language: "The rights of the people to be secured in their persons, their houses, their papers, and their <u>other property</u>, from all unreasonable searches and seizures, shall not be violated[.]" ***Altman***, 330 F.3d at 200 (emphasis in original)(quotations omitted). Congress ultimately replaced "other property" with "effects." Since then, federal courts interpret that substitution to narrow the Amendment — "other property" potentially would've included all privately-owned property (personal and real), but "effects" "refer[s] only to personal property, and particularly to goods or moveables." ***Id.*** at 201; ***U.S. v. Place***, 462 U.S. 696, 698-700 (1983)(luggage at airport was "effect" under Fourth Amendment); ***Bond v. U.S.***, 529 U.S. 334, 336-37 (2000)(carry-on bag on bus was "effect"); ***Jacobsen***, 466 U.S. at 114 (letters and other sealed packages, like a wrapped parcel, are "effects"); ***U.S. v. Jones***, 565 U.S. 400, 404 (2012)(vehicle is "effect").

Plaintiffs' well site components aren't "goods or moveables" like a suitcase, carry-on bag, mailed package, or vehicle. Rather, those items constitute a fixture, a water system affixed to Plaintiffs' undeveloped agricultural land, which, presumably, will remain permanently considering Plaintiffs assert they used the well site as a

primary source of water. Moreover, the very nature of a water system and common sense dictate a water system cannot be opened or rummaged through the way luggage, mail, or a vehicle can be.[5] Simply, Defendant isn't aware of any case — nor have Plaintiffs cited one — establishing a water system affixed to undeveloped, agricultural land and unconnected to a residence constitutes an "effect" intended to be protected from unlawful search under the Fourth Amendment.[6]

### 2. Even if the well site components were "effects", Plaintiffs had no reasonable expectation of privacy in them, so no search occurred.

Even if Plaintiffs' well site was an "effect" (it wasn't), no search occurred. "The Fourth Amendment does not prevent all investigations conducted on private property or all investigations of privately-owned items. Instead, only 'persons, houses, papers, and effects' are within the ambit of Fourth Amendment protection, and even then, only when expectations of privacy in such places and effects are reasonable[.]" *U.S. v. Crockett*, 707 F.Supp.3d 1075, 1084 (D. Kan. 2023) (emphasis added)(citations omitted); *see* *Hatfield*, 333 F.3d at 1196. As described in Section IV(A)(1) *supra*, Plaintiffs didn't seek to preserve their privacy, and any expectation of privacy they still purportedly had wasn't one society would consider reasonable.

---

[5] While the Supreme Court held police placing a GPS tracking device on a vehicle to obtain its location information also constitutes a "search" (*see* *Jones*, 565 U.S. 400), nothing invasive of that sort occurred here.

[6] Instead, Plaintiffs cite to caselaw generally reasoning searches conducted without warrants are unlawful (*Katz*, 389 U.S. at 357; *Jones v. U.S.*, 357 U.S. 493 (1958)), like police surreptitiously placing a tracking device on a person's vehicle without their knowledge or consent (*Jones*, 565 U.S. 400)—which, again, didn't occur here.

For instance, in **Bond**, the Supreme Court reversed the petitioner's conviction for conspiracy to possess and possession with intent to distribute methamphetamine, and determined a border patrol agent's squeezing of the petitioner's carry-on bag on the bus constituted an unlawful search under the Fourth Amendment. **Bond**, 529 U.S. at 335. The Court reasoned (1) the petitioner sought to maintain privacy by using an opaque bag and placing it directly above his seat on the bus, and (2) he had a reasonable expectation of privacy in the bag's contents because, while a bus passenger can expect other passengers or bus employees to move his bag for some reason, he doesn't expect they will feel the bag in an exploratory manner. **Id.** at 338-39. The Court explained tactile or "physically invasive inspection" like squeezing a carry-on is "simply more intrusive than purely visual inspection" like police observation of a backyard from a high-altitude plane, or police observation of a greenhouse in a home's curtilage via a slightly-lower-altitude helicopter, neither of which violated the Fourth Amendment because "any member of the public could have lawfully observed the defendants' property by flying overhead," and thus, the defendants' claimed expectation of privacy in those situations "was not reasonable and not one that society is prepared to honor." **Id.** at 337 (quotations omitted)(discussing **California v. Ciraolo**, 476 U.S. 207 (1986), and **Florida v. Riley**, 488 U.S. 445 (1989)).

Contrary to the petitioner in **Bond**, it was unreasonable for Plaintiffs to expect privacy when they didn't take substantial efforts to conceal their installation activities plainly visible to Defendant from the public road. [SADF ¶¶36-42]; *see*

Section IV(A)(1) *supra*. Defendant conducted a purely visual inspection of the Property, which any member of the public could've lawfully observed from the adjacent public road, while he was on said public road, such that his visit to the Property was essentially about gathering information from WWP. [SADF ¶¶36-42]; *see **Bond***, 529 U.S. at 337; ***Rieck***, 651 F.3d at 1189 ("a driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home" and "nothing shielded the area from public view").

Plaintiffs further assert the County's written code enforcement policy gave them a reasonable expectation of privacy. But this assertion overstates the policy's terms, which allowed Defendant to enter the Property first without an administrative warrant and required him to leave only when the property owner denied him access. [*See* RSUMF ¶24]. Plaintiffs' reading and understanding of the policy [*see* RSUMF ¶¶25-26] is irrelevant for purposes of what the policy actually provides. Plaintiffs haven't cited to precedent supporting their apparent assertion that their subjective reading and sense of the policy, combined with DeHerrera's eventual request to leave the Property, automatically invokes Fourth Amendment protections of the well site.

### 3. Even if Defendant "searched" Plaintiffs' "effects", his actions were de minimis.

Regardless of whether the alleged search was done within Plaintiffs' curtilage, or alternatively of their "effects", such search was de minimis and thus unactionable as discussed in Section IV(A)(2) *supra*.

**C. The Open Fields Doctrine Is The Appropriate Doctrine Here.**

Plaintiffs assert the open fields doctrine doesn't apply, arguing the Supreme Court never has applied the open fields doctrine to inspection of "effects" on private property but has "implied" an effect in an open field is entitled to Fourth Amendment protection. Wrong again, as demonstrated in *Dunn*, where the Court reaffirmed "the Fourth Amendment's protection accorded 'persons, houses, papers, and effects' d[oes] not extend to the open fields[.]" *Dunn*, 480 U.S. at 300. In fact, for over a century, the Supreme Court hasn't extended the "persons, houses, papers, and effects" clause to "open fields". *Hester*, 265 U.S. at 59. The *Dunn* Court didn't have to decide whether the barn alleged to be unlawfully searched was an "effect" or otherwise protected under the Fourth Amendment, because it was in open fields. The Court reasoned, even assuming the defendant had an expectation of privacy in his barn independent of "curtilage", the Fourth Amendment wasn't violated because the officers never entered either the barn or any other structure on the premises, and "merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front." *Dunn*, 480 U.S. at 303-05.

So the appropriate inquiry here, to ascertain whether the Fourth Amendment's sweep includes Plaintiffs' water system, is whether it is located within the curtilage or not, which it isn't, as described in Section IV(A)(1) *supra*. In fact, Plaintiffs concede their argument "the well site and the contents beneath the surface, including the water well and the pump," were their *effects* rests on the Court first finding their

water well site "was not within the curtilage of Plaintiffs' home,"[7] i.e., it was within open fields. Like the officers in ***Dunn***, Defendant merely stood outside the curtilage of Plaintiffs' trailer and in open fields on which installation of water system components occurred, about 40 feet away from the water system, making him about 80 feet away from the camper, and visually observed the water system. [SADF ¶¶63-64]. Plaintiffs' mere ownership of the water system components – like ownership of the barn in ***Dunn*** – doesn't automatically invoke Fourth Amendment protections against unlawful search of the water system. "'The premise that property interests control the right of the Government to search and seize has been discredited.'" ***Oliver***, 466 U.S. at 183 (quoting ***Katz***, 389 U.S. at 353). And even property interests in premises "may not be sufficient" for a legitimate expectation of privacy in particular items on, or activities on, the premises. ***Id.*** (quoting ***Rakas v. Illinois***, 439 U.S. 128, 144 n.12 (1978)); *see generally* ***Dunn***, 480 U.S. 294. Thus, the appropriate test is whether Plaintiffs' well site was within "curtilage" or within "open fields". Because it was the latter, the water system falls outside the Fourth Amendment's purview.

Plaintiffs contend ***Jones*** confirms the Fourth Amendment protects the water system as an "effect" in an open field. But ***Jones*** is distinguishable. The Supreme Court reasoned government installation of a GPS device on the defendant's vehicle in a public parking lot without his knowledge, to track its movements over a span of four weeks to apprehend him, was a "search" of an "effect". The officers "'did <u>more</u>

---

[7] Motion, p.11.

than conduct a visual inspection'" of the vehicle and, by attaching the GPS device, "encroached on a protected area." ***Jones***, 565 U.S. at 410 (emphasis in original). Here, Defendant <u>only</u> conducted a visual inspection, if anything, of the well site (which wasn't an effect). He didn't install any sort of GPS device on the well site components to track their whereabouts, but instead from the public road could see Plaintiffs in fact were installing them. Defendant's presence at the Property – unlike attachment of the invasive GPS device in ***Jones*** – didn't cause him to learn information he didn't already know from visual inspection outside the Property. [SADF ¶¶ 36-42].

### D. The Right to Be Free From a Search of a Well Site Within Either "Curtilage" or "Open Fields" Wasn't Clearly Established, Meaning Defendant Enjoys Qualified Immunity.

But more importantly, as Defendant argued in his own summary judgment motion and now reiterates, qualified immunity shields him from liability because the law surrounding his actions wasn't clearly established on or before July 13, 2021.

When a public employee ("official") raises qualified immunity, a presumption of immunity exists, and Plaintiffs must satisfy two elements: (1) Defendant's actions violated a federal constitutional right, and (2) that right was clearly established when Defendant allegedly acted unlawfully. *See **Estate of Taylor v. Salt Lake City***, 16 F.4th 744, 757-58 (10th Cir. 2021). The doctrine's "central purpose" is to protect officials "from undue interference with their duties and from potentially disabling threats of liability." ***Elder v. Holloway***, 510 U.S. 510, 514 (1994).

First, Defendant must've violated a federal constitutional right, with contours sufficient for a reasonable official in his shoes to understand his acts were unlawful. ***Saucier v. Katz***, 533 U.S. 194, 201-02 (2001). Such immunity shields officials "who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms." ***Pierce v. Gilchrist***, 359 F.3d 1279, 1299 (10th Cir. 2004). Second, the law must've been clearly established in this Circuit, implicating either directly-on-point U.S. Supreme Court or Tenth Circuit caselaw, or else the "clear weight" of other authorities. ***Medina v. City & Cnty. of Denver***, 960 F.2d 1493, 1498 (10th Cir. 1992). An official can't have violated a clearly-established right unless its contours are sufficiently definite that any reasonable official in his shoes would've known he was violating it. ***Plumhoff v. Rickard***, 572 U.S. 765, 778-79 (2014). The law isn't defined "at a high level of generality," as that "avoids the crucial question whether [Defendant] acted reasonably in the particular circumstances" he faced. ***Id.*** at 779. Further, "existing precedent" must've placed the constitutional question "beyond debate." ***Mullenix v. Luna***, 577 U.S. 7, 12 (2015)(per curiam).

While the right against unreasonable searches exists broadly under the federal Fourth Amendment (the Court already dismissing all claims under its Colorado equivalent), that right isn't unlimited or all-encompassing, applies only to specific circumstances, and as explicated in Plaintiffs' Motion involves only an impermissibly high level of generality. *See* ***Plumhoff***, 572 U.S. at 778-79 (the law isn't defined "at

a high level of generality"). Even if Defendant engaged in an unlawful warrantless search during his less-than-ten-minute visit to the Property, which he doesn't concede, the law wasn't clearly established his acts or failures to act were unconstitutional "beyond debate", *i.e.*, in specific circumstances contemplated by prior Fourth Amendment cases with legitimately parallel facts.

Specifically, no U.S. Supreme Court or Tenth Circuit case issued on or before July 13, 2021, clearly established the supposed unlawfulness of entering a vast parcel of real property: with no four-walled structure; with no colorable fence or improved area sufficient to notify anyone any part of it except maybe the trailer was "dwelling-like"; used for activities not commonly associated with a home's intimacy like storing vehicles and junk, farming, and animal husbandry; with no substantial steps to shield any activity on it from the public eye; where Defendant didn't come within either 80 feet of the "dwelling-like" trailer or 40 feet of the installation area; and where he simply was there to conduct a simple compliance visit and ask basic questions. No relevant, applicable precedent as of that date would've directed Defendant, or a similarly-situated reasonable officer, his actions constituted either an unlawful search within Plaintiffs' curtilage, or an unlawful search of their effects. *See, e.g.*, **Dunn**, 480 U.S. at 303-04. Indeed, Plaintiffs admit the basis of their effects argument is a nebulous <u>implication</u> an effect in an open field enjoys Fourth Amendment

protection[8], but a cursory implication isn't enough. *Carabajal*, 847 F.3d at 1210 (mere "inference" or "implication" from caselaw "cannot put the unlawfulness of certain conduct beyond debate").

Instead, the weight of authority from the Tenth Circuit and other courts as discussed in this Response indicates the course of Defendant's conduct either didn't implicate (or else was allowed by) the Fourth Amendment, so it cannot be said the "clearly established" weight of authority finds the law as Plaintiffs maintain, and at best Defendant's actions occupied that "hazy border" in which he enjoys qualified immunity. *See Waters v. Coleman*, 632 F.App'x 431 (10th Cir. 2015)(reversing determination that it was clearly established the force used was unreasonable).

## VI. <u>CONCLUSION</u>

In conclusion, for the above reasons, Defendant Jeffrey Bensman respectfully requests that this Court enter an Order: denying Plaintiffs' Motion for Summary Judgment in its entirety; and entering all other and further relief which the Court deems just and appropriate.

---

[8] Motion, p.15 ("The Court has <u>implied</u> that an effect in an open field is entitled to Fourth Amendment protection, unlike the "field" itself, and that the doctrine only applies to observations, and nothing more." (emphasis added)).

Dated and respectfully submitted this 23rd day of May, 2025.

*s/Matthew J. Hegarty*
Matthew J. Hegarty
HALL & EVANS, L.L.C.
1001 17th Street, Ste. 300
Denver, CO  80202
T:  303-628-3300
F:  303-628-3368
hegartym@hallevans.com
**ATTORNEY FOR DEFENDANT
JEFFREY BENSMAN**

I hereby certify the foregoing Response complies with the type-volume limitation within DDD Civ. P.S. III(A)(1) as augmented by ECF 84. Specifically, this Motion contains 6,499 words.

*s/Matthew J. Hegarty*
Matthew J. Hegarty

## CERTIFICATE OF SERVICE [CM/ECF]

I hereby certify that, on May 23, 2025, I electronically filed the foregoing

**RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FROM**

**DEFENDANT JEFFREY BENSMAN** with the Clerk of Court via the CM/ECF

system, which will send notification of the filing to the following email addresses:

Taylor G. Minshall
Tanner W. Havens
RELEVANT LAW – COLO. SPRINGS
tminshall@relevantlaw.com
thavens@relevantlaw.com
***Attorney for Plaintiffs***

Leslie L. Schluter
DAGNER | SCHLUTER | WERBER LLC
lschluter@lawincolorado.com
***Attorneys for Defendants Huerfano***
***County and Sam Jensen***

William T. O'Connell III
THOMPSON, COE, COUSINS & IRONS LLP
woconnell@thompsoncoe.com
***Attorneys for Defendant Terry Sandoval***

*s/Erica Cameron*
Erica Cameron, Legal Assistant